J3RVKETS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                        17 CR 243 (SHS)

ARASH KETABCHI,

                    Defendant.            SENTENCE

------------------------------x

                                          New York, N.Y.
                                          March 27, 2019
                                          4:33 p.m.


Before:

                    HON. SIDNEY H. STEIN,

                                          District Judge


                          APPEARANCES


GEOFFREY S. BERMAN,
      United States Attorney for the
      Southern District of New York
KIERSTEN A. FLETCHER
      Assistant United States Attorney

GARY G. BECKER
      Attorney for Defendant

ALSO PRESENT:  CHRISTOPHER BASTOS, NYPD

J3RVKETS

1           (Case called)

2           MS. FLETCHER:  Good afternoon, your Honor.

3           Kiersten Fletcher, for the government.

4           I'm joined at counsel's table by Detective Christopher

5   Bastos of the New York City Police Department and Homeland

6   Security Investigations.

7           THE COURT:  Good afternoon.

8           MR. BECKER:  And good afternoon, your Honor.

9           I'm Gary Becker, on behalf of Mr. Ketabchi, who is

10  standing here in court next to me.

11          THE COURT:  Good afternoon to both of you.

12          Now, Mr. Becker, we just had a conversation where some

13  of the defense counsel assembled here said they had not seen

14  the victim impact statements.

15          Have you had an opportunity to look at those?  Because

16  I'll give you whatever time you need.

17          MR. BECKER:  I have, your Honor.  I don't need any

18  additional time with respect to that.

19          THE COURT:  Where is the set that I handed down now?

20  Do you have it or is it another attorney?

21          MS. FLETCHER:  I believe Sam Schmidt, counsel for

22  Andrew Owimrin, has it in the courtroom.

23          THE COURT:  All right.

24          I have the following information that I reviewed, in

25  addition to obviously presiding over the trial of Mr. Owimrin

J3RVKETS

1    and Mr. Shahram Ketabchi:

2              I have the presentence report, revised on March 5th of

3    this year, along with the addendum and the sentencing

4    recommendation of 70 months on a guideline range of 70 to 87

5    months.  I have the psychiatric report of Eric Goldsmith, M.D.,

6    PLLC.  I have the sentencing memorandum of Arash Ketabchi

7    received by my chambers on March 12.

8              And in terms of the information that's relevant to all

9    the defendants, I have the government's, as I referred to it

10   before, relative culpability letter dated March 13; and I have

11   the government's sentencing letter for all the defendants dated

12   March 12 -- for the relevant defendants, I should say, dated

13   March 20.

14             Mr. Becker, is there any additional information I

15   should have?  Written information.

16             MR. BECKER:  No, your Honor.

17             And forgive me if I missed it, along with my -- you

18   may have said this.  Along with my sentencing submission and

19   Dr. Goldsmith's report, I also submitted a number of letters on

20   behalf of Mr. Ketabchi from numerous persons, many of whom --

21             THE COURT:  Many, many letters.  They are attached --

22   in the form I have them, they are attached to your sentencing

23   memorandum, and they are under document 387-12.

24             MR. BECKER:  Yes, your Honor.  Thank you.

25             THE COURT:  One two 15.

J3RVKETS

```
 1              So is that what you're referring to?  I've read all of
 2      that information.
 3              MR. BECKER:  Yes, your Honor.
 4              THE COURT:  All right.
 5              Government, any additional written information I
 6      should have?
 7              MS. FLETCHER:  Nothing written, your Honor.
 8              THE COURT:  Mr. Becker, have you and Mr. Arash
 9      Ketabchi had a full opportunity to read and discuss this
10      information, and have you, in fact, already discussed it?
11              MR. BECKER:  Yes, your Honor.
12              THE COURT:  I'll refer to this defendant as
13      "Mr. Ketabchi."  Obviously there's a brother who is going to be
14      sentenced as well.
15              Do you have any objections to the findings of fact in
16      the presentence report, Mr. Becker?
17              MR. BECKER:  Yes, your Honor.
18              Two of them are in my letter to the Court.  But
19      there's one that I picked up after my submission.  That is
20      paragraph 61, which discusses Mr. Ketabchi's mental and
21      emotional health and lists the psychotropic medications that
22      he's taking.
23              THE COURT:  All right.  Just a moment.
24              Let me go to my notes.
25              Yes, sir.
```

J3RVKETS

1          MR. BECKER:  On the second line of paragraph 61, it

2     says that he -- "he" meaning Mr. Ketabchi -- has been

3     prescribed and is taking five milligrams of Topomaz.  In fact,

4     that's Topamax; it's an "X," not a "Z."

5          THE COURT:  All right.  I'm going to change the X --

6     the "Z" to an "X."  The second line of paragraph 61.

7          MR. BECKER:  Thank you, your Honor.

8          And the dosage, I understand, is now 100 milligrams.

9     It had been 25, not five; it's been raised over time.

10          THE COURT:  I'm going to change five milligrams of

11     Topamax to 100 milligrams of Topamax.

12          MR. BECKER:  Thank you, your Honor.

13          The next objection is paragraph 15 --

14          THE COURT:  Now, on 61, am I correct that Ketabchi --

15     look at the third line.  Ketabchi has been under the care of

16     Dr. Joseph M. Verret, psychologist, since his arrest; is that

17     correct?

18          MR. BECKER:  Dr. Verret is a psychiatrist, not a

19     psychologist.

20          THE COURT:  Psychiatrist, I'm sorry.

21          MR. BECKER:  And since shortly after his arrest, at

22     the direction of pretrial services, Mr. Ketabchi was referred

23     to Dr. Verret, who sees Mr. Ketabchi periodically and also

24     monitors his medications.

25          THE COURT:  All right.

J3RVKETS

1          Well, we'll leave it as it is; there's nothing there

2     that's inconsistent with what you've just said.

3          What else?

4          MR. BECKER:  Your Honor, paragraph 15 -- this is in my

5     sentencing submission at page 12 -- says that the telemarketing

6     companies were separate, but interrelated entities, several of

7     which were owned and operated by Arash Ketabchi.

8          THE COURT:  Just a moment.  I want to turn my notes to

9     indicate that what you just said is on page 12.

10         Let me just take a look at it, sir.

11         (Pause)

12         THE COURT:  All right.  I see what's there.

13         Essentially, what you're saying -- and I think it's

14    true -- is that the stipulation in the plea is that he was

15    manager or supervisor, not an organizer or a leader.  And the

16    guideline calculations account for that.

17         So what are you asking?

18         MR. BECKER:  Well, my concern, your Honor -- that's

19    correct.  But my concern about paragraph 15 and also paragraph

20    20 is actually a concern that is prompted by much of what the

21    government has said in its submission, is that by saying in

22    paragraph 15 and then in 20 that Arash Ketabchi and William

23    Sinclair together owned and operated --

24         THE COURT:  I understand.  You think Sinclair is more

25    culpable than Arash because Sinclair was the owner and Ketabchi

J3RVKETS

1    was the supervisor of the floor and the manager.  That's your

2    point.

3              MR. BECKER:  Well, there are many reasons why I think

4    he's more culpable, that's certainly one.

5              My point is is that it's not accurate to say that

6    Ketabchi and Sinclair owned businesses together.  They did not.

7    Ketabchi worked for Sinclair.

8              THE COURT:  Okay.  All right.  Just a moment.

9              (Pause)

10             THE COURT:  All right.  How about on page 15 then --

11   paragraph 15, to say:  The telemarketing companies were

12   separate, but interrelated, entities, several of which were

13   owned by William Sinclair and operated by Arash Ketabchi and

14   William Sinclair.

15             MR. BECKER:  My understanding is that Mr. Ketabchi was

16   a manager or supervisor at Olive Branch marketing company owned

17   by Bill Sinclair.  I don't believe he managed any other

18   companies owned by Bill Sinclair.

19             THE COURT:  All right.

20             Government?

21             MS. FLETCHER:  Your Honor, I think the paragraph is

22   fine as is.  It does not indicate that the two of them managed

23   the companies together, only that --

24             THE COURT:  No, but it says he was an owner -- oh, I

25   see, because you're thinking about A-1.

J3RVKETS

1          MS. FLETCHER:  Correct.

2          They are both owners and operators of telemarketing

3     floors during overlapping points of time.  The point is that

4     both of them are former Manhattan Professional Group a/k/a Tax

5     Club employees, who then branched out to open up their own

6     sales floors.  The paragraph is accurate as is.

7          THE COURT:  All right.

8          But I understand the inference that Mr. Becker is

9     trying to avoid.

10         Let me just think for a moment.

11         (Pause)

12         MS. FLETCHER:  May I make a proposal, your Honor?

13         THE COURT:  Yes.

14         MS. FLETCHER:  It's not clear to the government why

15    William Sinclair needs to be in that paragraph at all.  The

16    government would be fine extracting him and just saying:  Owned

17    and operated by Arash Ketabchi, who was a former employee of

18    Manhattan Professional Group.

19         MR. BECKER:  I don't think that's accurate, your

20    Honor.  That's suggesting that Arash Ketabchi owned and

21    operated several companies.

22         What Arash Ketabchi did was he worked initially as a

23    salesman and sales manager for Bill Sinclair at Olive Branch.

24    Bill Sinclair asked him -- and he testified to this -- to open

25    up a merchant account called A-1, because Bill Sinclair's

J3RVKETS

1    merchant accounts had been shut down.

2              Ketabchi opened up an account at Bill Sinclair's firm

3    called A-1.  When Ketabchi left Olive Branch, he operated A-1

4    and had two or three employees.  Bill Sinclair had 15.

5              Mr. Ketabchi also opened up other merchant accounts

6    that he used when he sold under A-1 for the same reason that

7    Olive Branch had several merchant accounts.  Firms need

8    merchant accounts.

9              He operated this business out of his home.  He had two

10   or three employees.

11             The government has linked him with Bill Sinclair

12   throughout the PSR, throughout the sentencing memorandum.  And

13   I dare say, your Honor, if you look at the presentence

14   memorandum of the other -- excuse me, the presentence reports

15   of the other defendants in this case, I predict it will say,

16   wrongly, that Mr. Ketabchi and Bill Sinclair were organizers

17   and leaders of the scheme, because that's what my first PSR

18   said.  And that's what the government has been peddling

19   improperly.  He was a manager or supervisor.

20             THE COURT:  Well, he was a star of the trial that

21   didn't involve him.  He is mentioned throughout that trial,

22   throughout that trial.

23             MR. BECKER:  I'm aware of that, your Honor, very well

24   aware of that.  And I ask the Court today, when your Honor

25   considers Mr. Ketabchi's fate, to take into account that I was

J3RVKETS

1    not at that trial; that I could not confront any of the

2    witnesses who testified about him; that he did not have an

3    opportunity to be heard.

4           And I ask the Court -- while I'm not suggesting the

5    Court should block out of its mind what your Honor may have

6    heard, the fact of the matter is -- and I've read much of the

7    transcript and I was here for portions of Bill Sinclair's

8    testimony.

9           THE COURT:  Your client, Mr. Ketabchi, was here

10   through most of it as well.

11          MR. BECKER:  Well, I was only here for two days, but I

12   understand he may have been here more.

13          And there's no question, and I have -- I don't think

14   the government will dispute that Sinclair and Mike Finocchiaro

15   owned Olive Branch; and that Mr. Ketabchi worked for them, for

16   those two.  And that he --

17          THE COURT:  Well, wait.  Because I think we may have

18   common ground here, but I'm not really sure what you're

19   arguing.

20          If you're arguing that Sinclair owned Olive Branch and

21   Ketabchi did not, the government is not going to disagree with

22   you on that, are you, government?

23          MS. FLETCHER:  No, we're not, your Honor.

24          I think the argument is likely to relate to the other

25   entities that Arash Ketabchi operated after he left Olive

J3RVKETS

Branch.

1          MR. BECKER:  Your Honor, when I get to my general

2   sentencing remarks, I will have more to say on the subject of

3   what Mr. Ketabchi did and didn't do and his relative

4   culpability.  And I appreciate the Court's concern about my

5   objection to paragraph 15 in the PSR.  But trying to keep it

6   cabined for now, paragraph 15, I think any objective reader

7   would read that and say, Oh, Arash Ketabchi and Bill Sinclair,

8   they owned and operated the companies.

9          THE COURT:  The government has agreed to take out

10  "Sinclair" from that paragraph, so don't fight that.

11         MR. BECKER:  That makes it worse.  Then it looks like

12  only Ketabchi owned and operated these companies.  He didn't.

13         MS. FLETCHER:  Ketabchi --

14         THE COURT:  Just a moment.

15         We're not going to relitigate it in the context of

16  paragraph 15.

17         (Pause)

18         MR. BECKER:  I think the fairest thing to say is that

19  there were several telemarketing companies.  Mr. Ketabchi

20  overall was deemed the manager, was supervisor in the criminal

21  activity.  The government stipulated he's not an organizer or

22  leader.  In light of that, to then say, Oh, he owned and

23  operated these companies, no lawyer, no layperson would read

24  those two sentences together.

J3RVKETS

1          THE COURT:  All right.  I got it.  I got it.

2          (Pause)

3          THE COURT:  Didn't your client own A-1, and it went

4     under a variety of names?

5          MR. BECKER:  He opened up the merchant account at A-1

6     at the direction of Bill Sinclair while he was still at Olive

7     Branch so that Olive Branch could use that account and get the

8     monies from the sales.  When he left Olive Branch, he began

9     working on his own and he ran his business under the name A-1,

10    yes.

11         THE COURT:  Fine.  Okay.

12         (Pause)

13         THE COURT:  Arash was also a former employee of The

14    Tax Club, right?

15         MR. BECKER:  Yes, your Honor.

16         THE COURT:  This is how I'm changing paragraph 15:

17         "The telemarketing companies were interrelated

18    entities."  I'm going to change it to:  "Several of the

19    telemarketing companies were interrelated entities which were

20    either managed or owned and operated by, among others, Arash

21    Ketabchi, who was a former employee of Manhattan Professional

22    Group, d/b/a The Tax Club, a Manhattan-based telemarketing

23    entity that offered tax preparation services to customers until

24    it was disbanded following a Federal Trade Commission

25    enforcement action in 2012."  That's paragraph 15.

J3RVKETS

1        Do you also have an objection to 20; is that correct?

2        MR. BECKER:  Yes, your Honor.

3        That's addressed at page 12 of my sentencing

4   memorandum.

5        THE COURT:  Yes, I see it.

6        MR. BECKER:  And it goes -- yes, page 12.

7        THE COURT:  Government, in the plea agreements for

8   McGowan, Sinclair, and Finocchiaro, do they stipulate to being

9   leaders and organizers?

10        MS. FLETCHER:  The plea agreements for Mr. Sinclair

11   and Mr. Finocchiaro don't include a guidelines calculation,

12   your Honor.

13        THE COURT:  All right.  Yes.  Right.

14        MS. FLETCHER:  The plea agreement for Joseph McGowan

15   indicates that he is a leader or organizer.

16        MR. BECKER:  Your Honor, on that point, I should tell

17   the Court that when the PSR first came in, this paragraph said

18   that Arash Ketabchi, Joseph McGowan, William Sinclair, Michael

19   Finocchiaro, and Joseph McGowan were leaders and organizers of

20   the scam.  And I objected because clearly the government had

21   stipulated that Mr. Ketabchi is not a leader/organizer, but

22   rather manager/supervisor.

23        THE COURT:  That we've dispensed with that.

24        I agree with your point.

25        MR. BECKER:  Yes.

J3RVKETS

1      And so what they've done here is they've grouped him

2   in.

3      With respect to the question your Honor just asked,

4   McGowan's plea agreement says he's an organizer or leader.  If

5   William Sinclair wasn't an organizer or leader in this case,

6   then I'll eat my hat.

7      THE COURT:  This is how I'm changing --

8      MR. BECKER:  He started the company --

9      THE COURT:  I understand.  I understand.

10      This is how I'm changing it:  I'm changing paragraph

11   20 to read:  "Arash Ketabchi was a manager and supervisor.  And

12   Joseph McGowan, among others, was a leader or organizer of this

13   criminal activity."  And then it continues on.

14      MR. BECKER:  Very well.

15      THE COURT:  Fair enough?  Is that what you said?

16      MR. BECKER:  I said very well, thank you.

17      THE COURT:  Okay.

18      Have I handled your objections, sir, to the

19   presentence report?

20      MR. BECKER:  One final one, it's on the top of page 13

21   of my sentencing memorandum concerning the penultimate sentence

22   on page 22.

23      THE COURT:  Let me turn to it.

24      All right.  This is how I propose -- that's not really

25   a finding of fact, in any event; it's their recommendation.

J3RVKETS

1    But I can see --

2         MR. BECKER:  Your Honor, I'm not referring to the

3  recommendation, I'm referring to --

4         THE COURT:  You said justifications section, page 22;

5  that's a sentencing recommendation.

6         MR. BECKER:  No, your Honor, if I said that, I

7  misspoke or perhaps your Honor misheard me.  I'm referring

8  specifically to the penultimate sentence on the page that says:

9  "Erroneously, during the defendant's -- "

10         THE COURT:  That's what I'm talking about also, sir.

11         MR. BECKER:  Forgive me, your Honor.  That's not the

12  actual recommendation; that's just a comment about whether --

13         THE COURT:  You see the title at the top of the page?

14         MR. BECKER:  Yes, your Honor.

15         THE COURT:  What does it say?

16         MR. BECKER:  Yes, your Honor.

17         THE COURT:  What does it say?

18         MR. BECKER:  "Sentencing Recommendation."

19         THE COURT:  Okay.

20         This is how I propose we change the penultimate

21  sentence:  On the page that says "Sentencing Recommendation,"

22  under the subhead "Justifications":  "During the defendant's

23  presentence interview, defense counsel requested that we rely

24  on the inculpatory statement made by defendant during the plea

25  allocution."

J3RVKETS

1          Any objection?

2          MR. BECKER:  Yes, your Honor.

3          What I'm asking is that the sentence that says:

4   "During the defendant's presentence interview, he was advised

5   by defense counsel not to discuss his involvement in the

6   instance offense or to provide a statement for acceptance of

7   responsibility."  I'm asking that that sentence be stricken

8   because, as is correctly noted in paragraph 29 of the PSR, it

9   says, and I quote:  "During the interview, the defendant

10  provided a statement to the probation officer wherein he

11  admitted involvement in the offense."

12         THE COURT:  Okay.  Sir, did you request of the

13  probation officer that instead of your client providing a

14  statement for acceptance of responsibility, the probation

15  department rely on the statements your client made during his

16  plea allocution?

17         MR. BECKER:  No.  He made a statement and also

18  provided a written statement, just as it says in paragraph 29.

19         THE COURT:  All right.  Just a moment.

20         (Pause)

21         THE COURT:  So you did not request that the probation

22  department rely on your client's statement?

23         MR. BECKER:  Certainly not exclusively.  He made a --

24         THE COURT:  All right.  This is --

25         MR. BECKER:  Paragraph 29 --

J3RVKETS

1          THE COURT:  This is a great deal about nothing.

2          Let me change the proposal.  And again, it's not in

3     the findings of fact in the presentence report, but I'm trying

4     to accommodate you.

5          And I think this is what you want:  Instead of the

6     penultimate sentence and the ultimate sentence on page 22, that

7     I substitute "The defendant provided a statement to the

8     probation officer wherein he admitted involvement in the

9     offense."  All right?

10         MR. BECKER:  Yes, your Honor.  Thank you.

11         THE COURT:  Government?

12         MS. FLETCHER:  Fine, your Honor.

13         THE COURT:  All right.

14         MR. BECKER:  And your Honor --

15         THE COURT:  That was 15 minutes about nothing.  Done.

16         MR. BECKER:  The reason I pressed this is because he's

17    accepted responsibility from earlier on; I wanted the Court to

18    be clear that he did so during the interview.

19         THE COURT:  I'm changing the last two sentences of the

20    justification paragraph as I've set forth.

21         Government, do you have any objections to the findings

22    of fact in the presentence report?

23         MS. FLETCHER:  No, your Honor.

24         THE COURT:  Mr. Becker, tell me what you want me to

25    know.  I've read all of this information, I assure you, and I

J3RVKETS

1    also presided over the trial.  What do you want me to know?

2              MR. BECKER:  Thank you, your Honor.

3              Let me begin by saying I mentioned that the last

4    couple of rows in the courtroom have people here on behalf of

5    Mr. Ketabchi, and that includes his father, Mohammed Ketabchi.

6              THE COURT:  You have to talk to me; I couldn't hear

7    you.

8              MR. BECKER:  Forgive me, your Honor.

9              It includes his father, Mohammed Ketabchi, who I think

10   might be raising his hand.

11             THE COURT:  Sir, Mr. Ketabchi, welcome, sir.

12             And he's been here before, as a matter of fact, when

13   Shahram Ketabchi was here last week or the week before.  And

14   I've read your letter, sir, I understand very heartfelt letters

15   from everybody.

16             MR. BECKER:  It includes a Dr. Ali Maz, whose last

17   name I have difficulty pronouncing.  He's a chiropractic

18   physician --

19             THE COURT:  Welcome, sir.

20             MR. BECKER:  -- who wrote to your Honor.

21             Including -- and this is not so much in the letters,

22   an individual named Mark Quinn, who I hope is raising his hand.

23             THE COURT:  Yes, he's doing better than that, he's

24   standing up.

25             MR. BECKER:  Mr. Quinn is Mr. Ketabchi's sponsor at

J3RVKETS

Alcoholics Anonymous.

    THE COURT:  And I've read all of the letters about what an excellent sponsor he is from a variety of people. There's no doubt about that.

    MR. BECKER:  And then there are a number of other family members and supporters who are here in court.

    THE COURT:  And everyone is welcome.

    MR. BECKER:  Your Honor, I've had the great privilege and responsibility of representing lots of people over the years accused by the government of committing crimes.  I feel a particular sense of responsibility and importance here today, given what's at stake for Mr. Ketabchi and his family, given the torturous long path that got us here today and, quite frankly, given --

    THE COURT:  I'm not sure what that means.  The man was indicted, a defense lawyer was appointed, an excellent defense lawyer, he negotiated a plea, and here he is today.  So what's torturous?

    MR. BECKER:  Well, your Honor, because for two years the case has been over his head, and this day of judgment is now upon us.  And I can only imagine what it must be like being in a circumstance where you know that you're coming into a courtroom where you know you're going to get sentenced to jail; where you know you're going to have to say good-bye to the people who love you.  And, quite frankly, what's also been

J3RVKETS

1    torturous is the interactions that I've had having learned

2    about Mr. Ketabchi's bipolar disorders, about his addiction

3    disorders, about the havoc that it wreaked in his life, and

4    about the efforts that he's made to overcome it.

5            Your Honor, I assure the Court that when you're living

6    with someone in the sense that I've been living with

7    Mr. Ketabchi, what I mean is having had so many contacts with

8    him over these past two years, it's been quite a journey.

9            And so I stand here today knowing that your Honor,

10   when you sentence Mr. Ketabchi today, you're going to be

11   sentencing the whole man, not just his offense conduct; his

12   weaknesses, his strengths, his good characteristics, his

13   lifetime of good deeds over the years, his particular work in

14   Alcoholics Anonymous.

15           The government writes in its sentencing memorandum:

16   "No amount of kind gestures or good deed erases the fact that

17   for years he defrauded people."

18           Of course it doesn't erase --

19           THE COURT:  For years what?

20           MR. BECKER:  He defrauded people.

21           The government says his good deeds do not erase the

22   fact that he defrauded people.

23           Of course it doesn't erase the fact; and I haven't

24   argued that it erases the fact.  But his good deeds and his

25   ministering to people in Alcoholics Anonymous, his carrying a

J3RVKETS

1   man down a flight of stairs who is infirmed so he can go to the

2   doctor, his handing out food to people on the street who are

3   homeless, his buying dozens of pizzas and giving them out.  The

4   things that he has done in his life are highly relevant under

5   3553(a).  And they do not erase his bad deeds, but they must be

6   considered as mitigation and that's why I've presented it to

7   the Court.

8          I think that all the evidence shows that the man who

9   emerges from both Dr. Goldsmith's report and the letters, and

10  the offense conduct, which I've made no effort to minimize or

11  to contest -- but what we have here, Mr. Ketabchi is a

12  big-hearted and generous man who's been a force for good in

13  many persons' lives.  He is a severely damaged man by a long

14  documented history of bipolar disorder and addiction disorder.

15  Dr. Goldsmith's report, which is quite comprehensive and

16  lengthy --

17          THE COURT:  I've read it very carefully.

18          MR. BECKER:  -- the government has not disputed one

19  word in that report.  And the probation department acknowledges

20  that Mr. Ketabchi's bipolar disorder and addiction disorders

21  might have contributed to the offense conduct.

22          Mr. Ketabchi --

23          THE COURT:  I don't think anyone is disagreeing with

24  that.  Go ahead.

25          MR. BECKER:  Mr. Ketabchi did not choose to have this

J3RVKETS

1    disorder; he did not choose to suffer from bipolar.

2              THE COURT:  No, but he chose to keep on calling Ms. --

3    I think it's Ms. Thompson, tried to max her out.

4              MR. BECKER:  Your Honor, that was unquestionably the

5    worst thing that he did --

6              THE COURT:  I'm not sure about that.  Go ahead.

7              MR. BECKER:  -- in this case.

8              Well, I think certainly it was a big number.

9              But, your Honor, what we have from Dr. Goldsmith is

10   his unquestioned conclusion that Mr. Ketabchi's mental

11   disorders -- he says to a reasonable degree of psychiatric

12   certainty, Mr. Ketabchi's criminal behavior crossing the line

13   and making false unsustainable promises to customers is, in

14   part, explained by his bipolar mood disorder and addictive

15   behavior characterized by grandiose and expansive mood

16   impulsivity, racing thoughts, boundary crossings, and increased

17   psychomotor activity.

18             THE COURT:  To the extend I understand those words in

19   their technical sense, I don't think I disagree either.  The

20   fact that he would get a rush out of defrauding somebody and

21   would constantly go back to them and again try to get more

22   money and more money and more money and to take advantage of

23   them, I think, in part, stemmed from his psychological state.

24   He was getting endorphins or something.

25             MR. BECKER:  Yes.  Exactly.

J3RVKETS

1          THE COURT:  I don't think there's any question about

2     that.

3          MR. BECKER:  Dopamine.

4          THE COURT:  That certainly does not change the fact

5     that he was defrauding people knowingly and willingly and

6     intentionally and maliciously.

7          MR. BECKER:  I have written in my memo that his mental

8     disorders and addiction does not excuse his conduct, is not

9     excuse for his conduct, is an absolutely mitigating factor.

10         5H1.3 of the sentencing guidelines, which the statute

11    requires your Honor to consider, specifically talks about how

12    when mental illness is a factor in a case, to some degree the

13    Court may consider that.

14         And the one word that your Honor used a moment ago

15    which I respectfully disagree with is "malicious."  I don't

16    think this man is malicious.  I think the evidence --

17         THE COURT:  All right, then strike that.

18         Intentionally and knowingly.

19         MR. BECKER:  Intentionally and knowingly he was driven

20    by compulsive, grandiose thoughts that Dr. Goldsmith says he

21    had difficulty controlling.  People with bipolar disorder and

22    addictive personalities --

23         THE COURT:  You're not saying he didn't know what he

24    was doing, right?

25         MR. BECKER:  No, your Honor.  No, your Honor.

1          If Mr. Ketabchi's mental illness and addiction was a

2     defense, we might have gone to trial.  It is not a defense.

3          He is guilty.

4          THE COURT:  What 5H number were you addressing?

5          MR. BECKER:  5H1.3, your Honor.

6          THE COURT:  Yes, it's a policy statement.  I see it.

7          Go ahead.

8          MR. BECKER:  It's a policy statement that the

9     Sentencing Commission has promulgated.  And even if 5H1.3 --

10          THE COURT:  I'm not giving him a departure under

11     5H1.3, which is a policy statement; nor, I think, under the

12     plea agreement can you ask for it, although I'm not sure.  But

13     I obviously am taking this psychiatric report into account when

14     I sentence him.

15          Go ahead.

16          MR. BECKER:  Your Honor, the government for some

17     reason in this case early on, and persisting to this day, took

18     the position that Mr. Ketabchi was at the top of the heap and

19     was the most culpable.  And they did so notwithstanding that

20     all of the objective criteria that we rely on in determining

21     culpability shows that he's not the most culpable.

22          One is that he was a manager or a supervisor, not an

23     organizer or leader.  We've covered that.

24          Two, the amount of restitution that he has been found

25     responsible for, that is, the money that he got from

J3RVKETS

1    identifiable victims that he's got to pay back by virtue of the

2    restitution order, which he has agreed to, is approximately --

3              THE COURT:  He's agreed to restitution of $563,427.99?

4              MR. BECKER:  That is correct, your Honor.

5              THE COURT:  And you've agreed to a forfeiture order in

6    the same amount?

7              MR. BECKER:  No, the forfeiture order is --

8              THE COURT:  I'm sorry.  It's one million --

9              MR. BECKER:  $59,000.

10             THE COURT:  $1,059,803.84?

11             MR. BECKER:  Yes, your Honor.

12             THE COURT:  All right.

13             Government, have I signed the forfeiture order

14   already?

15             MS. FLETCHER:  No, your Honor.

16             AUSA Sobelman went to get one for --

17             THE COURT:  All right.  Submit it to me by today or

18   tomorrow.

19             MS. FLETCHER:  We will, your Honor.

20             MR. BECKER:  So let's look at those numbers for a

21   minute, because I think it sheds light on the relative

22   culpability.

23             First forfeiture.  That's the amount of money that

24   came into an account or accounts that Mr. Ketabchi controlled.

25   And the number again is 1,059,000 and change.  That's the total

J3RVKETS

1   number that the government determined came into -- that he

2   grossed, if you will.  And that includes A-1 monies, I believe,

3   while he was at Olive Branch.

4          William Sinclair testified that in 2014 alone, one

5   year, he grossed $5 million.  And we can, I think, say then --

6   because he started in 2012 and 2013 and went till he was

7   arrested -- his total numbers, God knows what they were, maybe

8   they were 15 or $20 million.

9          Joseph McGowan, who the government determined should

10  get four levels for being an organizer or leader, he took in,

11  according to his plea agreement, $1,763,582.05, almost double

12  what Mr. Ketabchi did.  His restitution, your Honor, is the

13  same amount, if I'm right about that.

14         THE COURT:  I'm not sure what your point is.  If your

15  point is that your defendant is not the worst of these

16  defendants, that's okay with me, if that's what you want to

17  say.  I think what you're reading to me are agreed-upon

18  forfeiture amounts, is that correct, and restitution amounts.

19         MR. BECKER:  Yes, they are agreed upon after the

20  government determined that those were the amounts it accurately

21  stated what each defendant got, yes.

22         And I am bringing all of this to the Court's attention

23  because the government has gone out of its way, both in the PSR

24  and in their sentencing submission, to try to paint

25  Mr. Ketabchi as the single most culpable defendant in this

J3RVKETS

1  case.  And when you look at the duration of his involvement,

2  when you look at the amount of money he grossed, when you look

3  at the role that they say he occupied, when you look at the

4  amount of restitution, and when you look at what motivated his

5  criminal conduct, namely, mental illness and drug addiction, as

6  opposed to malicious --

7           THE COURT:  I don't understand.

8           MR. BECKER:  -- he's not the most culpable.

9           THE COURT:  Sir.

10          Look, I'm taking into account the psychiatrist report

11 here.  I'm taking into account the fact that he got a rush out

12 of defrauding people.  That is not the same as saying -- I'm

13 sorry, I don't have Live Note here.  I think what you just said

14 is he was compelled to do it by his mental illness.  I don't

15 know if "compelled" was your word, but that was the sense I

16 got.  That's not the same thing.

17          The fact that his actions result, at least in part, in

18 his mental makeup, that's obvious.  But I don't think you can

19 say he was controlled by this mental illness and therefore he

20 had no free will or no -- his actions were not knowing and

21 voluntary.

22          MR. BECKER:  Your Honor, I do not believe I've said

23 anything from which you could reasonably say that his actions

24 were not knowing and voluntary.  He pleaded guilty.  It was an

25 element of the offense.

J3RVKETS

```
1        I'm saying that what drove his conduct is highly

2   relevant in determining how bad a person he was; in

3   determining --

4        THE COURT:  This is not about how bad he is; it's

5   about the crimes he committed.

6        MR. BECKER:  Yes, your Honor.

7        And what I'm saying is -- I'll give you this example:

8   William Sinclair, I saw some of his testimony and I read a lot.

9   And Mr. Ketabchi, the government says in its sentencing

10  submission, was among the most culpable because he was the most

11  aggressive.  He pushed boundaries where others didn't.  He was

12  sort of a bull in a china shop.

13       Well, first of all --

14       THE COURT:  Well, he was pushing the salesmen to do

15  more and more and more, yes.

16       MR. BECKER:  Yes.

17       And you know what?  That bull in a china shop

18  approach, that aggressiveness, that pushing boundaries, is the

19  exact terminology that Dr. Goldsmith uses in his report.

20       THE COURT:  All right.  I understand the point.

21       What else do you want to tell me?

22       MR. BECKER:  That's the mental illness.

23       I think your Honor may have conflated the mental

24  illness with the drug addiction.  The mental illness, which is

25  the bipolar, is the compulsiveness.  The getting the rush, the
```

1  dopamine fix, from the sale, not from defrauding people, from

2  closing the deal, closing the deal, he --

3          THE COURT:  Closing the fraudulent deal.

4          MR. BECKER:  Yes, your Honor.

5          THE COURT:  Got it.

6          MR. BECKER:  It's the closing of the deal, that is

7  separate and apart from the compulsive grandiose thinking

8  that's caused by bipolar.  It was a very toxic cocktail, okay?

9  And that's what drove him.

10          People like Finocchiaro and Sinclair, smooth

11  operators.  Key gloves.

12          Sinclair testified both on direct and on cross --

13          THE COURT:  I would say Sinclair was more slick than

14  smooth, but I think we're talking about the same thing.

15          MR. BECKER:  I was being too kind when I called him

16  smooth.  Slick.  Unctuous maybe, you know?  Dripping.

17          THE COURT:  He also knew to plead guilty early.

18          MR. BECKER:  And Mr. Ketabchi came to me very early on

19  and said, I want to plead guilty early too.  And I told the

20  government that, and that's one of the reasons I pressed that.

21          So those guys, it's not --

22          THE COURT:  You're not arguing acceptance of

23  responsibility points, are you?

24          MR. BECKER:  Why would I do that?  He gets

25  acceptance --

J3RVKETS

1          THE COURT:  You're right.  I thought you were pushing

2     another -- pushing for more than that.

3          MR. BECKER:  No, no, no.  You made the comment that

4     Mr. Sinclair has the good sense --

5          THE COURT:  He has the three points for acceptance;

6     correct?

7          MR. BECKER:  Yes, your Honor.

8          THE COURT:  All right.

9          MR. BECKER:  So I forgot the word, your Honor, the

10     slick -- the slick Mr. Sinclair, the reason that he maybe

11     wasn't as aggressive is because, as he testified, he just

12     wanted to stay under the radar, but defraud as many people as

13     he could.  He was more, respectfully, a sociopath.

14          THE COURT:  You're telling me that there are people

15     more culpable than your client.  I understand that point.

16          MR. BECKER:  Okay.

17          THE COURT:  What do you want to tell me about your

18     client that you haven't?

19          MR. BECKER:  Okay.  Very well, your Honor.

20          I want to just briefly --

21          THE COURT:  And I don't want the record to reflect at

22     all any suggestion that this man is not getting acceptance of

23     responsibility points.  He is.

24          Go ahead.

25          MR. BECKER:  The last thing I want to say about his

J3RVKETS

1    offense conduct, lest the government again stand up and say

2    he's the worst person in the case and should get an above

3    guidelines sentence --

4            THE COURT:  There are a lot of really -- people who

5    have done very serious things here.

6            Go ahead.

7            MR. BECKER:  So Mr. Ketabchi, according to the

8    government, his offense conduct caused at least five people,

9    but fewer than 25 people, to suffer substantial financial harm,

10   at least five, but fewer than 25.  That's very serious.  But

11   it's not tanking a market.  It's not wiping out a community.

12   It is bad --

13           THE COURT:  Quote, page 6:  "The conduct was certainly

14   serious, but it did not wreck financial markets or involve

15   force or extortion or obstruction of justice."

16           Is that the point you want to make?

17           MR. BECKER:  Yes, your Honor.

18           But even with respect to telemarketing frauds, even

19   with respect to --

20           THE COURT:  You don't want to hear an argument that

21   could be made that defrauding elderly feeble people unable to

22   withstand his onslaught and the onslaught of other workers,

23   when he was a manager of them, may, in fact, be more serious

24   than wrecking a financial market or obstructing justice?  I

25   certainly could see the argument; I don't have to come down on

J3RVKETS

1    it one way or the other.

2             Were you here for any of the victim testimony?

3             MR. BECKER:  Your Honor, I've read much of the

4    testimony.

5             Your Honor, I was making the point not what your Honor

6    picked up on from my sentencing memorandum, but that I just --

7             THE COURT:  You were quoting from your sentencing

8    memorandum.  And I did too.

9             MR. BECKER:  No, no, no.  I was saying he defrauded --

10   well, if I referenced the sentencing memorandum, I'll obviously

11   defer to the Court's recollection.

12            What I meant to be referring to, what I thought I was

13   referring to, is that he defrauded more than -- he caused more

14   than five, but fewer than 25, people to suffer substantial

15   financial harm.  And that is really bad.  But it's not the

16   highest adjustment under the guidelines.  It wasn't 500 people;

17   it wasn't 1,000 people.  It was bad, your Honor.  I'm not

18   making excuses for it.  But I'm trying to bring some reality to

19   the table.  It was bad.  It was really bad.  But it was not a

20   Marc Dreier fraud; it was not tens of millions of dollars.

21            So that's the last thing I want to say about the

22   offense conduct.  And he did not, as some of the codefendants

23   do, sell debt relief.

24            THE COURT:  Sell what?

25            MR. BECKER:  Sell debt relief.

J3RVKETS

1          THE COURT:  Debt relief.

2          MR. BECKER:  Some of the defendants in this case maxed

3    people out on their credit cards and then called them up and

4    said, I represent a company, Bill Sinclair, that comes to the

5    aid of people who have been defrauded.  We can relieve you of

6    your debt, and then he defrauded them again.  That's something

7    Mr. Ketabchi did not do.

8          What Mr. Ketabchi did --

9          THE COURT:  Did he try to sell the physical machines

10   to Ms. Thompson?

11         MR. BECKER:  I believe no, he did not.  He did not.

12         THE COURT:  All right.  Good on him.

13         MR. BECKER:  What he sold, your Honor, was, again,

14   fraud, capital letters, fraud.  He sold essentially the

15   tangibles that Mr. Quiles delivered, but he did so on bogus

16   promises of false earnings.  In other words, buy these things

17   and you'll make all this money.  And he admitted to that.

18         THE COURT:  I think they were having problems, if I'm

19   not mistaken, with his giving specific promises about returns,

20   which other people said you can't do, you can't do, if I

21   remember correctly.

22         MR. BECKER:  Your Honor, I think the salesmen in this

23   case, part of this terrible fraud, they all basically did the

24   same thing.  It was how they did it.  Some of them had a soft

25   touch, some of them had an aggressive touch.

J3RVKETS

1          THE COURT:  You're probably right.

2          MR. BECKER:  If you look closely at the government's

3     sentencing letter, and they talk about why he's so bad, they

4     talk about because he was so aggressive.  He's aggressive

5     because he's a sick man and that's his style.  But ultimately

6     what he did is what everybody did.  And you know what?  He

7     didn't do as long as the other people and his numbers aren't as

8     big.

9          Moving on.

10          I didn't know Mr. Ketabchi went to AA -- let alone was

11     a mentor there -- until the letters started coming in.  And I

12     won't belabor it, because I know your Honor has read it.  You

13     have a letter from Ken Boede, you have a letter from Lizzy

14     de Vries, Mr. Quinn, who I spoke to.

15          Mr. Quinn is in the courtroom here today.  I took him

16     aside -- I didn't meet him before today -- and I said, How

17     often does Mr. Ketabchi come to AA?

18          He said, Basically, every day.

19          I said, Does he just come for himself?

20          No.  He is a shining light at AA.  He has gotten many

21     people through to their sobriety.  He has saved people.

22          Mr. Quinn is here today.  He will tell that to your

23     Honor if your Honor wants to ask him.  He knows him 12 years.

24          You have Ken Boede, who says, I know it sounds like an

25     exaggeration, but this man has saved hundreds of lives.

J3RVKETS

1          It's remarkable.  It's a remarkable testament to him.

2          He is deeply flawed.  He is deeply flawed.  He can at

3     the same time save a life and help her life.  There's no

4     question about it.

5          The government wants everything to fit into a neat

6     cubbyhole; all bad, bad, bad.  There's not one word in the

7     government's sentencing submission about Mr. Ketabchi's mental

8     illness, not one syllable.  They focus solely on the offense

9     conduct.

10          This is a man who saves lives.  This is a man who, as

11     I think I may have already referenced, Dr. Ali M.'s letter,

12     about there was a patient who was very ill infirmed, and

13     Mr. Ketabchi carries him down steps once a week.

14          THE COURT:  You already told me that and I already

15     read it.

16          MR. BECKER:  Your Honor, the other thing that I want

17     to -- I'm drawing to the end of my remarks.  A couple of

18     things.  Very important.

19          When I was learning about Mr. Ketabchi's mental

20     illness and read Dr. Goldsmith's report, I contrasted the

21     behavior that's detailed in that report, the behavior that your

22     Honor is going to sentence Mr. Ketabchi for, with the fact that

23     for the last two years, since his arrest in this case, he has

24     shown remarkable post-offense rehabilitation.  He has, of

25     course, made every court appearance, as required; he's supposed

J3RVKETS

1    to.

2          THE COURT:  This argument is once he's caught, he

3    cleaned his act up, is that what this argument is?

4          MR. BECKER:  This argument is that once they got his

5    psychotropic medications right, he was able to clean up his

6    act, and that's where I was going with it, Judge.

7          He made every court appearance; he's gone to every

8    psychological appointment; every psychiatric appointment; AA,

9    as I said.  He works six days --

10          THE COURT:  He's a wonderful AA sponsor.  I have

11    letters here.  I've written it down.  There's no question about

12    that.

13          MR. BECKER:  Gets up every morning at 5 a.m. and works

14    six days a week.

15          So I said to Mr. Ketabchi -- and I began this

16    presentation today talking about how Topamax is now 100

17    milligrams.

18          THE COURT:  He has excellent letters from his family.

19    His father is devastated by the two boys' actions.  His

20    wonderful letter from his father.

21          MR. BECKER:  Dr. Verret, who was his treating

22    physician under the auspices of pretrial services, has tinkered

23    with his medication.  The medication that he has been on the

24    last two years, he was not on when he was selling at Olive

25    Branch, he was not on when he was at A-1.  He was adrift.  He

J3RVKETS

1    didn't have the medicine he needed.  And so the symptoms of his

2    disease manifested themselves.

3          He has gotten out of sales.  He's not in sales

4    anymore.

5          THE COURT:  I would hope not.

6          MR. BECKER:  And he shouldn't be in sales.

7          Bill Sinclair is in sales still, Mike Finocchiaro is

8    in sales, other defendants may be in sales.

9          He got out of sales.  He owns his misconduct.  He's

10   taking his meds.  And he is, I respectfully submit, no longer

11   in danger of reoffending, provided he does that, provided he

12   continues to get help and provided he continues to --

13         THE COURT:  Oh, something tells me he's not going to

14   recidivate again.  But just as before, my concern is more

15   general deterrence.  Other telemarketing fraudsters need to

16   hear that you go to jail when you take the life savings of

17   multiple people.

18         MR. BECKER:  I agree.  And my sentencing memorandum

19   says he should go to jail.  It says 27 months.

20         THE COURT:  I'm not inclined to give him the upward

21   departure that the government wants, but he's going to jail.

22         MR. BECKER:  I understand that, your Honor.  And I've

23   suggested that he go to jail in my sentencing memorandum.  I

24   said no more than 27 months.

25         Your Honor, I cited a study in my sentencing

J3RVKETS

1    submission.  It is the swiftness and certainty of punishment

2    that deters people, the length doesn't.  It's very easy for us

3    to pat ourselves on the back as prosecutors and say, A longer

4    sentence is needed to send a message.

5           Nobody in the telemarketing world looks at a guy who

6    gets 27 months in jail and says, I think I'll do it.  But if he

7    gets 36 months, he won't do it.

8           And I ask the Court to consider the reality of what

9    happens to a human being when you put him in a cage or in a

10   cold jail cell and you close the door.

11          You know, when Paul Manafort was sentenced not long

12   ago, the very first sentence where he got a sentence a lot of

13   people complained about, the judge, in setting forth reasons

14   for his sentence, said, You know -- I think he turned to the

15   government, he said, Have you ever spent a day in a jail cell?

16   Have you ever spent a week?  Did you ever spend a month, how

17   cold and foreboding it is, how it destroys lives.

18          And what good is going to come out of putting him in

19   jail an extra six months or an extra year or an extra two

20   years?  What good comes out of that, so that his -- so that he

21   comes out more of a broken man, so that he comes out more torn

22   away from his very, very, very strong safety net, so that he's

23   torn away from his psychiatric treatment?  Because he's not

24   going to get that in jail, Judge.  He's not going to get that

25   in jail.

J3RVKETS

1      He should be given a minimal jail sentence; it should

2  be accompanied, when he gets out, by strict pretrial -- excuse

3  me, supervised release.

4      THE COURT:  You stipulated to a guideline range of 70

5  to 87 months; correct?

6      MR. BECKER:  No.  I stipulated that those were the

7  applicable advisory sentencing guidelines.  And as the Supreme

8  Court and Second Circuit has said multiple times, those

9  guidelines are -- not only are they not presumed reasonable --

10 excuse me, not only is there not a presumption that they are

11 reasonable, but they are not to be presumed reasonable.

12     THE COURT:  I understand.  They are a starting point,

13 and you're entitled to argue variances under the advisory

14 guidelines.  I understand that.

15     MR. BECKER:  It's one factor under -- it's 3553(a)(6).

16 And there's seven factors, and that's one of them.

17     And I've never argued that the Court shouldn't

18 consider the offense conduct.  But there's other factors to

19 consider.

20     I haven't spoken -- and I won't at length -- about

21 Mr. Ketabchi's daughter Ryan, who is not his biological

22 daughter, but he's raised her since she's five --

23     THE COURT:  He writes about her lovingly.

24     MR. BECKER:  It's easy to say he should have thought

25 about her before he did these crimes.  That's for sure.  But,

J3RVKETS

1   again, I think these crimes, again, were motivated by the

2   factors we talked about.  And even if he was less than as

3   thoughtful as he should be, it doesn't mean that this Court

4   should be less thoughtful as it should be.  And I think the

5   Court can consider that as well.

6        This is a young girl whose biological father abandoned

7   her, and this is her daddy.  And he cares for her with every

8   fiber in his body.  He's got to go to jail.  I know it, he

9   knows it.

10       I ask your Honor to consider all of the factors under

11  3553(a) and give him a sentence that is sufficient, but not

12  greater than necessary.

13       THE COURT:  All right.  Thank you, sir.  I appreciate

14  your remarks.

15       I think this started by my asking Mr. Becker whether

16  he had any objections to the findings of fact in the

17  presentence report, and we took off from there.

18       Does the government have any objections to the

19  findings of fact in the presentence report?

20       MS. FLETCHER:  No, your Honor.

21       THE COURT:  All right.

22       I adopt the findings of fact with the changes that I

23  made them.

24       Mr. Becker has spoken on behalf of the defendant.

25       Government, what would you like to tell me?

J3RVKETS

1          MS. FLETCHER:  Your Honor, I won't belabor the points

2     that are in our submission, but I think there are certain --

3     there are certain things that Mr. Becker raised orally in court

4     that bear addressing.

5          It appears to the government that Mr. Becker would

6     like for there to be a formula for culpability.

7          THE COURT:  Like there to be a?

8          MS. FLETCHER:  A formula.  He would like the Court to

9     say, This person's numbers are higher than this other person's

10    numbers in this category and this category and, therefore, what

11    he did isn't as serious; therefore, he should get a lesser

12    sentence.

13         And to a certain extent, the guidelines are formulaic.

14         But the government, as your Honor is aware, has

15    requested an upward variance in this case from the stipulated

16    guidelines range.

17         I think your Honor a moment ago may have said

18    departure.

19         THE COURT:  I said departure.  That's wrong.  You're

20    seeking -- because you're bound by the agreement as well,

21    you're seeking a variance; correct?

22         MS. FLETCHER:  Yes, we are, your Honor.

23         And I know that your Honor has been on the bench for a

24    long time; and so the significance of that request is not lost

25    on the Court.

J3RVKETS

1          And the reason for the government making that request

2    is that, without hesitation, the conduct that Arash Ketabchi

3    involved himself in in this case is the worst conduct we've

4    seen.  It doesn't matter that he only caused substantial

5    financial hardship to more than five people and less than 25,

6    because what he did for a living every day for years was take

7    advantage of extremely vulnerable people.

8          Your Honor has referred to Ms. Thompson, Jane

9    Thompson, a number of times already.  He made it his business

10   to take every dime she had.

11          THE COURT:  Actually, my recollection is he tried to

12   take more than that.

13          MS. FLETCHER:  I believe he just tried to take all of

14   her money, your Honor.  And to demonstrate the government is

15   making no excuses and no apologies for William Sinclair, it was

16   Mr. Sinclair's company who may have tried to take more than

17   that.

18          THE COURT:  My notes indicate that -- I think this was

19   from trial testimony, that he did -- that at his urging, at his

20   insistence, Ms. Thompson invested about $100,000 in merchant

21   terminals.  That's why I asked the question of Mr. Becker.  Am

22   I wrong about that?

23          MS. FLETCHER:  Question, as I heard it, your Honor,

24   was, Did he sell her a machine?  And the answer is no,

25   technically, he didn't sell her a machine.  Another company,

J3RVKETS

1   Elite, an Arizona-based lead source from whom Arash purchased

2   leads, had sold Ms. Thompson a merchant terminal business,

3   where she was supposed to get these machines to be placed in

4   businesses and would earn a commission on the swipes in them.

5   She, of course, never got those machines.

6          What Arash's company did is purported to sell her

7   services for that company so that the merchant terminal

8   business she'd already purchased could make money.

9          THE COURT:  I see.  All right.

10         MS. FLETCHER:  And then, as your Honor will recall,

11  after Arash Ketabchi and Andrew Owimrin sold her essentially

12  every business opportunity product they could conceive of, but

13  realized she still had money left, they sold her on this notion

14  of investing $150,000 in an equity stake in A-1 Business

15  Consultants.

16         THE COURT:  That's when he was in A-1.

17         She didn't do that though, right?

18         MS. FLETCHER:  She did that.

19         THE COURT:  She did?  She invested the extra 150?

20         MS. FLETCHER:  She cleared literally every dollar out

21  of her bank account.  I don't know that it's every dollar, but

22  this woman has no money because of what Arash and Andrew did to

23  her.  She left her home, she cleared out her savings, she lives

24  in a trailer.  When she came up here to testify, she couldn't

25  even buy herself a sandwich.

J3RVKETS

1          Her life, her financial situation, is completely

2     destroyed because of this defendant.  And she's just one

3     example.  She's, I suspect, the worst victim example, but she's

4     just one.  This is what he and the people working for him were

5     doing every day.  They were doing this to people like Patricia

6     Cabral, who your Honor learned during our trial was an elderly

7     woman who had been diagnosed with dementia.

8          THE COURT:  This is the one where he threatened the

9     son, right?

10          MS. FLETCHER:  Yes.

11          THE COURT:  Go ahead.

12          MS. FLETCHER:  He initially told the son, Oh, we have

13     lawyers involved; we're going to work this out for you, before

14     ultimately threatening the son with a lawsuit.

15          Those are just some examples of the way that Arash

16     Ketabchi operated.

17          THE COURT:  Did he end up ever selling grants?  My

18     notes indicate that he expressed an interest in selling grants,

19     which were really just a complete fraud; there wasn't even any

20     receivables there -- I mean any deliverables.  Did he do

21     anything with grants, to your knowledge?

22          MS. FLETCHER:  So there was a period of time when

23     grants were sold at the Olive Branch marketing floor.  I don't

24     know whether Arash was there at the time.  I don't remember.

25          The agent is writing me a note.

1          What he absolutely did is even at a time when everyone

2    else wanted to stay far away from brass, Arash was willing to

3    purchase grant leads.  So people who had been sold this fake

4    grant and who were expecting, incorrectly, to get $100,000 in a

5    90-day period, what Arash did was convinced those people that

6    if they invested in a business opportunity service, that would

7    hold them over until their grant came in.  So while he

8    understood these grants didn't exist, he sold services to

9    people as a means of holding them over until the grant that was

10   never going to come came.

11          And he did that -- and this is in our submission --

12   after Carl Morris was arrested for selling grants.  He

13   indicated to Carl Morris during that time that he was willing

14   to keep going.  He wanted -- and this was in a conversation

15   with his partner, Pete Diquarto at the time, he wanted to drive

16   the car until the wheels fell off.  He did not care.

17          So, your Honor, the point I'm trying to make here and

18   the point that underlies much of the arguments in the

19   government's submission, is that context matters.

20          Mr. Becker has made a lot of comparisons between Arash

21   Ketabchi and Bill Sinclair.  Bill Sinclair is absolutely slick.

22   The government will make no apology for him; and he will have

23   his day before your Honor for his own sentencing.

24          But if your Honor will recall, Bill Sinclair testified

25   at the trial of Mr. Owimrin and Shahram Ketabchi that part of

J3RVKETS

1   the reason that there were problems between him and Arash is

2   that Arash was creating too many chargebacks.  So Bill Sinclair

3   implemented a policy where salespeople would be responsible for

4   their own chargebacks.  That's what precipitates Arash leaving.

5         When Arash left, he starts A-1; he supervises Andrew

6   Owimrin and his brother -- not more than five people -- so he's

7   a manager as opposed to a leader or an organizer.  But the

8   conduct is the same.  And the government would argue it's

9   without the oversight of Bill Sinclair and Mike Finocchiaro

10  that things really go off the rails.

11        Your Honor heard the recording between Arash and

12  Andrew Owimrin with respect to Charlene Foster.  They talk

13  about just putting charges on a potential victim's credit card

14  because she won't even realize it.  It's that type of conduct

15  that is exemplary, even in this case.  Even where all the

16  defendants in this case are committing fraud all day, every

17  day, there are examples like this that are almost always

18  associated with Arash Ketabchi.

19        Your Honor, Mr. Becker's submission and his remarks

20  today focus a lot on the good that Arash has done and his

21  efforts to minister others in their sobriety.  The government's

22  view about Arash Ketabchi's culpability and his role in this

23  offense is, in large part, colored by that.  Because during

24  much of the offense, as your Honor heard during trial, William

25  Sinclair, at different points, was taking 40 Oxycodone pills a

J3RVKETS

1   day.  Nearly everyone was addicted to some form of extremely

2   potent and dangerous narcotics.  Arash Ketabchi wasn't.  He was

3   sober during that time.  And instead of taking steps to

4   minister Andrew Owimrin, who, I think, is fairly viewed as his

5   younger cousin, he was preying upon the fact that Andrew

6   Owimrin had this addiction.  He was using Andrew --

7             THE COURT:  My notes indicate that at some point

8   Ketabchi was using cocaine, heroin, OxyContin, and Xanax.

9             MS. FLETCHER:  Your Honor, Mr. Becker can correct me

10  if I'm wrong.  My understanding from speaking to virtually all

11  the witnesses in this case is that but for a short period of

12  time just before his arrest, Arash Ketabchi was not using

13  drugs, certainly not to the extent that Andrew Owimrin,

14  Christopher Wilson, Joseph McGowan, Bill Sinclair, Michael

15  Finocchiaro were using huge amounts of Oxycodone on a daily

16  basis.

17            And it was during this time that Arash was both using

18  Andrew Owimrin's urine to procure additional Oxycodone to sell.

19            And that's telling, your Honor.  Remember during the

20  trial there was a discussion about why someone would need

21  urine --

22            THE COURT:  No, I remember that.  You needed dirty

23  urine for somebody to prescribe you the OxyContin.

24            MS. FLETCHER:  Right.

25            And Arash Ketabchi didn't have dirty urine, because

J3RVKETS

1   he, unlike nearly everyone around him, wasn't doing drugs.  But

2   he saw an opportunity to take advantage of the fact that

3   everyone around him was addicted to drugs.  He used Andrew

4   Owimrin's urine to get an Oxycodone prescription so that he

5   could profit off of everyone else's drug addiction.

6           Now, this is in a short line in our submission, but

7   during this same time period, throughout much of 2014, Arash

8   was involved with other people trying to ship Oxycodone into

9   New Jersey to distribute to others.  The government has spoken

10  with witnesses about that.  He was not just committing

11  telemarketing fraud, he was also selling pills to the

12  vulnerable people around him.  And that is particularly --

13          THE COURT:  Well, he's being sentenced today for

14  telemarketing fraud.

15          MS. FLETCHER:  Yes.  He's not charged with the

16  Oxycodone distribution.  The government is merely offering it,

17  that information, to provide context for his personal history

18  and his characteristics and the seriousness of his offense.  To

19  the extent the Court will consider the drug addictions of the

20  other defendants as mitigating -- and the government agrees the

21  Court should -- that mitigating circumstance not only was not

22  present with Arash Ketabchi, but it was something that he used

23  to take advantage of other people around him.

24          Your Honor, I've taken a lot of notes.  I think your

25  Honor is very familiar with the facts of this case.

J3RVKETS

1          There is not a formula for culpability.

2          Arash Ketabchi lived --

3          THE COURT:  Mr. Becker was focusing really on two

4    things:  One, other people were committing worse crimes than

5    this man; and two is he was driven by his mental state.  What's

6    your response to that?  He's not saying his mental problems

7    made him do it, but he's saying -- he's coming close to that,

8    but he's saying you have to take that into account.

9          MS. FLETCHER:  Your Honor, with respect to the first

10   point, whether other people were committing more serious crimes

11   than him --

12         THE COURT:  You don't have to address that.

13         Next point.

14         MS. FLETCHER:  But I want to address it, your Honor.

15         THE COURT:  Go ahead.

16         MS. FLETCHER:  The government disagrees.  For the

17   reasons I've just stated, the government disagrees.

18         I cannot identify a crime that's been committed by

19   anyone involved in this scheme that is worse than what Arash

20   Ketabchi did to Jane Thompson and what he did to Andrew Owimrin

21   and the other people who were addicted to drugs around him.

22         With respect to the mental illness issue, I'm not a

23   psychiatrist.  I read the psychological report with care.  I

24   have no basis to challenge that Arash engaged in risky

25   behavior.  I don't think it's mitigating in this circumstance.

J3RVKETS

1    I think it explains why he did what he did.  It also explains

2    why the Court needs to protect the public from future crimes of

3    this person, and why the Court should impose a sentence that

4    provides adequate punishment.

5           He was able to support a comfortable, extravagant

6    lifestyle for many, many years at the expense of real people.

7    Mr. Becker said this isn't a market crash case.  No, it's not.

8    But what Mr. Ketabchi was doing was talking to actual humans,

9    talking to people and lying to them and taking their money and

10   ruining their lives in many instances.

11          Mr. Becker said that he's been a force for good in

12   many people's lives.  That may be true, but he has also been a

13   significant force of destruction.  And people who would

14   consider committing the crimes that he has committed, and who

15   may think to themselves, Well, I can support myself and my

16   family for ten years.  And if I get caught, so I go to jail for

17   two years?  That's worth it.

18          I think people in that situation might actually think

19   it's worth it.

20          The punishment here should be severe.  It should send

21   a message that people who do what Arash Ketabchi did have to be

22   held accountable and responsible.  And so for that reason, the

23   government believes a sentence above the guidelines range is

24   necessary to achieve the purposes of sentencing here.

25          THE COURT:  All right.  Thank you.

J3RVKETS

1          MR. BECKER:  Your Honor, if I may briefly respond.

2          I was listening very carefully --

3          THE COURT:  Just a moment, sir.

4          (Pause)

5          THE COURT:  Let me hear from Mr. Ketabchi, then you

6     can tell me whatever you want.

7          MR. BECKER:  Yes, your Honor.

8          THE COURT:  Mr. Ketabchi, you don't have to say

9     anything to me; but if you wish, you certainly can.

10          THE DEFENDANT:  Thank you, your Honor.

11          Thank you for your time and for allowing me to speak

12     in front of you today.

13          I wholeheartedly apologize for my offense conduct.  I

14     wake up every day with shame and regret thinking that I took

15     part in causing pain to so many victims of this case.  In no

16     way, shape, or form am I justifying or excusing my choices or

17     behaviors related to my offense conduct.  I admit that I have

18     shortcomings and, at the beginning of this legal case, I let my

19     ego, untreated mental health issues, and addiction get in the

20     way, and I did not portray or conduct myself in the favorable

21     light of my true character.

22          I've been working through my remorse towards the

23     victims in individual therapy.  I've been trying to give back

24     through acts of service in the Alcoholics Anonymous community.

25          THE COURT:  Sir, if you could speak more loudly and

J3RVKETS

1   more slowly.

2           THE DEFENDANT:  Sure.  Just a little nervous.

3           THE COURT:  No, of course.  I understand that.  Take

4   your time.  But the reporter needs to be able to take it down.

5           THE DEFENDANT:  Sorry about that.

6           I have struggled with mental health issues and

7   addiction for a majority of my life.  I recently celebrated two

8   years of continuous sobriety and abstinence from substance

9   abuse.  I am grateful to share that I have been consistently

10  seeking mental health treatment for my diagnosis of bipolar

11  disorder and managing my psychotropic medications.  I have

12  complied with everything that has been expected from me from

13  probation and pretrial.

14          I have gained a lot of insight about myself and the

15  underlying mental health issues of untreated mania and

16  depression leading to my poor judgment and behaviors during my

17  involvement with the telemarketing business.  My heart and my

18  true self and my character is not defined by the telemarketing

19  business I was involved in.  I am a father, a son, partner,

20  brother, and friend.  There are many different parts to who I

21  am.

22          I have been working very hard every day making an

23  honest living, as I have been waking up at 5 a.m. every day and

24  commuting to New York City from New Jersey to help my

25  72-year-old father run his health shop.

J3RVKETS

1        The past two years --

2        THE COURT:  But isn't that -- didn't he give you some

3   of those shops way early on and you drove them into bankruptcy?

4        THE DEFENDANT:  Yeah, those were candy shops, yes.

5        THE COURT:  Go ahead.

6        THE DEFENDANT:  The past two years have been a very

7   eye-opening experience for me.  I have been truly humbled.  I

8   have learned that my actions have consequences, and that my

9   actions affected everyone and every part of my life.

10        I am deeply saddened and ashamed and sorry to my loved

11   ones, including my friends and family and, in particular, my

12   father, my daughter, my sister, my partner, and my brother.

13        My daughter, Ryan, did not have a father figure until

14   we met, when she was four years old.

15        THE COURT:  Take your time, sir.

16        THE DEFENDANT:  We have been inseparable since a

17   concern that my past poor choices are going to affect her

18   emotional and mental well-being and cause her additional

19   abandonment issues.  My 11-year-old daughter is still

20   developing and does not deserve her father to not be present

21   for her development milestones.  We are very close.  And she

22   could not attend today because she could not bear watching me

23   get sentenced, nor did I want to expose her to this trauma.

24        I also feel tremendous guilt that my brother, Shahram,

25   was involved in this legal case.  I blame myself --

J3RVKETS

1          THE COURT:  You brought him in; correct?  You brought
2     him in.
3          THE DEFENDANT:  He was just my assistant.
4          MR. BECKER:  He said he blames himself, your Honor, as
5     your Honor was speaking.
6          THE COURT:  Okay.
7          THE DEFENDANT:  I understand and agree, and I need to
8     pay the consequences for my criminal conduct.  I am ready to
9     continue on this positive path I have been on for the past two
10    years.  And I am ready to give back to the victims and make my
11    amends.
12         I have reflected on my behavior for two years and have
13    learned so much from it.  I am accountable for my bad
14    decisions, poor judgment, and mistakes, and I am remorseful for
15    the victims involved.
16         Your Honor, I kindly ask for your grace and leniency
17    for a fair and appropriate sentence, with my daughter, mental
18    health, and addiction in mind.  I know actions speak louder
19    than words, and I want an opportunity to show my amends to the
20    victims and walk the talk.
21         Thank you again for your time and consideration with
22    my life-changing sentence.
23         THE COURT:  Thank you, sir.
24         I appreciate those remarks.  I believe you are truly
25    remorseful, there's no question.  I think those remarks, all of

J3RVKETS

1    them, were very genuine and heartfelt on your part.  And I

2    appreciate your delivering them here.

3            Mr. Becker.

4            MR. BECKER:  Yes, your Honor, if I may briefly respond

5    to what Ms. Fletcher said.

6            As I was saying, I listened very carefully.

7    Ms. Fletcher began by saying that, in the government's view,

8    Mr. Ketabchi's conduct was the worst conduct we've seen.  And

9    then I waited for Ms. Fletcher to say what that conduct was.

10   And it was Jane Thompson essentially taking everything she had;

11   and also being very, very aggressive with another person who

12   Ms. Fletcher identified by name.  And he did do that.

13           And in total, more than $200,000 was taken from

14   Ms. Thompson.  And the total amount of restitution from

15   everyone else identified by the government as to his victims is

16   another 300,000 and change.

17           So if what the government means when they say the

18   worst conduct was his, because he took $200,000 from one

19   victim, fine.  But if the government means that his conduct was

20   the worst because he did it the longest, stole the most money,

21   or did the worst things, that's wrong.  Your Honor asked

22   Ms. Fletcher if he ever sold grants.  And I think Ms. Fletcher

23   said he considered it, but didn't do it.

24           And the next question is --

25           MS. FLETCHER:  That's not what I said, your Honor.

J3RVKETS

```
 1            MR. BECKER:  Well, I don't believe there's any
 2   evidence that he ever sold grants.  Debt relief, which everyone
 3   says was the single worst thing -- people who had already been
 4   maxed out, then they go and they try to sell them -- We can
 5   save you from the criminals who maxed you out, when they were
 6   the criminals.  He never did that.  And others in this case
 7   did.
 8            When you consider his victims and the fact that he
 9   victimized people, more than five, but fewer than 25, I
10   believe -- I can't say with certainty -- that virtually every
11   single defendant in this case has guidelines where they're held
12   accountable for victimizing to the extent of causing
13   substantial financial harm of more than five and fewer than 25.
14   If he's the worst, why is he in the same category as everyone
15   else?  Because he's not the worst.  And the government would --
16            THE COURT:  I don't think you really want to be
17   fighting this fight on the basis of whether your client is the
18   worst of the worst --
19            MR. BECKER:  Okay.
20            THE COURT:  -- or not the worst of the worst.
21            MR. BECKER:  That's what the government stood up and
22   argued.
23            THE COURT:  But I'm not concerned about that.
24            MR. BECKER:  Okay.  Very well.  Then I'll move on.
25            THE COURT:  I'm concerned about what he did, which is
```

J3RVKETS

1     bad.

2                 MR. BECKER:  It is, your Honor.

3                 THE COURT:  Not whether he's the worst.

4                 MR. BECKER:  To just clarify his drug use, okay,

5     Mr. Ketabchi's anniversary date -- and for anyone who knows

6     about drug addiction and alcohol, an anniversary date is when

7     he last used drugs, is February 26, 2017.  He was arrested

8     March 21st, 2017.  I said '17, right?  '17.

9                 So this man is about the most hardcore drug addict

10    that I've ever encountered in my life.  And if you read Dr.

11    Goldsmith's report, as I know you have, his drug of choice

12    doesn't exist.  Because you name a drug, he's abused it:

13    Heroin, cocaine, Oxycodone, hallucinogens, speed, marijuana,

14    you name it.  He is as hardcore as it gets.

15                THE COURT:  Oh, he's not the worst of the worst.

16                Go ahead.

17                MR. BECKER:  When it comes to drug addiction -- I take

18    that was a quip, yes, your Honor?

19                THE COURT:  It was.  It was you've handled cases of

20    drug dealers who have taken every kind of drug that exists and

21    many that have been artificially manufactured.  That's all I

22    was saying.

23                MR. BECKER:  Fair enough.

24                THE COURT:  But, again --

25                MR. BECKER:  Just to shed light, the Court had asked

1    whether or not he had used drugs, and he had.

2              THE COURT:  All right.  That I understand.

3              MR. BECKER:  And your Honor, the last thing I'll just

4    say about the relation between his mental health and his

5    conduct, Dr. Goldsmith writes that patients who are in a

6    hypomanic mood have not lost touch with reality.  But people

7    with these conditions have great difficulty in putting the

8    brakes on their intensely driven behavior; their judgment and

9    self-control can be seriously impaired.  And that's what

10   happened here.

11             So those are my remarks.

12             Ms. Fletcher talked about drug involvement and

13   involving Andrew Owimrin.  Your Honor interjected that you're

14   not sentencing him today for that.  I'm going to take your

15   Honor at your word on that.

16             The government's details about his drug use came --

17   the details of it came to life for the first time I got this

18   report.  I didn't have a chance to be at trial.  I did look at

19   Mr. Owimrin's testimony, and he said that on a single occasion

20   Mr. Ketabchi asked him for urine so that he could get

21   Oxycodone.

22             THE COURT:  There was testimony about that at the

23   trial.

24             MR. BECKER:  Thank you, your Honor.

25             THE COURT:  Well, I'm sorry this discussion, which was

J3RVKETS

1    indeed a lengthy discussion, seems to have veered into whether

2    or not this defendant is the worst of the defendants in terms

3    of wrongdoing or whether he's the worst of anybody the defense

4    lawyers have seen in terms of drug use.  That's not really

5    what's at issue here.

6           What's at issue here is the criminal conduct of this

7    defendant and what he did, which we've been going over and,

8    again, it's in all the reports.  It obviously is very, very

9    serious, because it does involve real human beings who have

10   been destroyed.  And we have a lot of victim impact statements;

11   and we have the testimony, live and on tape at the trial.  And

12   Mr. Ketabchi was really driving a lot of that and pushing other

13   salesmen and pushing his victims, other salesmen to sell more

14   and his victims to be cheated out of more.

15          Human beings are complicated.  He has done good things

16   in his life, there's no question about that.  He had a

17   strong -- the presentence report says it's upper middle class

18   upbringing.  He certainly has family support, articulate

19   letters from family members.  So people are complicated.

20          He certainly has mental issues that is good that they

21   are being addressed.  They obviously were one factor here.  But

22   I can't and won't blink at the serious wrongdoing that's

23   occurred.

24          I am not going to go above the guideline range, but I

25   am going to sentence this defendant at the top of the guideline

J3RVKETS

```
1    range.  And again, there's no presumption attached to the

2    guidelines.  But I do feel that 87 months is an appropriate

3    sentence here.  And that is my intention.

4              Mr. Ketabchi, if you would rise.

5              Pursuant to the Sentencing Reform Act of 1984, it is

6    the judgment of this Court that the defendant, Arash Ketabchi,

7    is hereby committed to the custody of the Bureau of Prisons to

8    be imprisoned for a term of 84 months.

9              Upon release from imprisonment, Mr. Ketabchi shall be

10   placed on supervised release for a term of three years, with

11   the conditions recommended by the probation department, namely

12   the following mandatory conditions:

13             He shall not commit another federal, state, or local

14   crime; he shall not illegally possess a controlled substance;

15   he shall not possess a firearm, dangerous weapon, or

16   destructive device; he shall refrain from any unlawful use of a

17   controlled substance; he shall submit to one drug test within

18   15 days of his placement on supervised release, and at least

19   two unscheduled drug tests thereafter as directed by the

20   probation officer; he shall cooperate in the collection of DNA

21   as directed by his probation officer.

22             He shall comply with standard conditions 1 through 13,

23   plus the following special conditions:

24             He will participate in outpatient treatment program

25   approved by the probation department to include testing to
```

J3RVKETS

1    determine whether he has reverted to using drugs or alcohol.

2    He will contribute to the cost of services rendered.  I

3    authorize the release of available drug treatment evaluations.

4         He has to provide his probation officer with access to

5    all requested financial information.  He must not incur new

6    credit charges or open additional lines of credit without the

7    approval of his probation officer unless he's in compliance

8    with the installment payment schedule.

9         He must participate in outpatient mental health

10   treatment program approved by the probation office.  He must

11   continue to take prescribed medications.

12        He must submit his person, residence, place of

13   business, vehicle, and all other property to search if his

14   probation officer has reasonable suspicion that contraband or

15   evidence of a violation of any condition of supervised release

16   may be found.

17        As an additional condition of supervised release, I am

18   requiring that Mr. Ketabchi pay all taxes owed at any time,

19   either in the past or during his period of incarceration and

20   supervision, and must work out a payment plan with the IRS or

21   pay the back taxes due.

22        Within 72 hours of release from the custody of the

23   Bureau of Prisons, Mr. Ketabchi shall report in person to the

24   probation office in the district to which he is released.

25        I am not imposing a fine because I find that the

J3RVKETS

1  defendant lacks the ability to pay a fine, after taking into

2  account the presentence report, his modest income, his limited

3  earning ability, and the restitution and forfeiture orders I am

4  going to impose.

5          Now, the restitution is agreed upon; is that correct,

6  Mr. Becker?

7          MR. BECKER:  Yes, your Honor.

8          THE COURT:  I hereby impose restitution in the sum of

9  $563,427.99, payable to the victims that will be set forth on a

10  schedule to be filed with the Clerk of Court.

11          I've considered the factors set forth at 18 U.S.C.

12  3664(f)(2), and specifically I've considered the losses

13  sustained by the victims, the financial resources of this

14  defendant, his financial needs and earning ability, and his

15  dependents' needs as well.

16          I hereby order Mr. Ketabchi to pay to the United

17  States a special assessment of $100, which is due immediately.

18          If Mr. Ketabchi is engaged in a BOP non-UNICOR work

19  program during his incarceration, he must pay $25 per quarter

20  toward the criminal financial penalties.  If he participates in

21  the UNICOR program as a Grade 1 through 4, he must pay 50

22  percent of his monthly UNICOR earnings toward the criminal

23  financial penalties.  The restitution must be paid in monthly

24  installments of 20 percent of Mr. Ketabchi's gross monthly

25  income over his period of supervision to commence 30 days after

1    his release from custody.

2              I am also imposing a forfeiture order of five hundred

3    sixty-three thousand four hundred twenty-seven dollars and --

4    I'm sorry.  That's incorrect.  The amount consented to is

5    $1,059,803.84, and the government is directed to provide me

6    with a stipulation and order to that effect.

7              (The Court conferred with the deputy)

8              THE COURT:  Oh, I'm sorry.

9              (Pause)

10             THE COURT:  I'm checking something.

11             The sentence is 84 months -- I'm sorry.  It's very

12   late and I apologize.  87 months.  It's the top of the

13   guidelines.  87 months.

14             Let me restate it.  My deputy has told me that I

15   switched.  87 months.

16             Mr. Becker, is there something I can help with?

17             MR. BECKER:  I'm sorry, your Honor.

18             THE COURT:  No, I'm just asking.

19             MR. BECKER:  I signed a forfeiture order, and I wasn't

20   sure if I should hand it to your Honor or to Ms. Fletcher.

21   That's what we were doing.

22             THE COURT:  I thought there was an issue that needed

23   my attention.

24             MR. BECKER:  No.

25             THE COURT:  Mr. Becker, are you aware of any legal

J3RVKETS

1    reason why this sentence should not be imposed as I have stated

2    it?

3               MR. BECKER:  No, your Honor.

4               But before you impose it, I have two very short

5    requests.

6               One is that your Honor -- given that your Honor

7    recommends to the Bureau of Prisons, that Mr. Ketabchi receive

8    the benefit of the residential drug -- the intensive

9    residential drug treatment program.  As the record is clear, he

10   has serious addiction issues.  That's request number one.

11              And request number two is that your Honor recommend to

12   the Bureau of Prisons that Mr. Ketabchi be designated to the

13   satellite prison camp in Lewisburg, Pennsylvania.

14              THE COURT:  Government, are you aware of any legal

15   reason why this sentence should not be imposed as I have stated

16   it?

17              MS. FLETCHER:  No, your Honor.

18              THE COURT:  I hereby order the sentence to be imposed

19   as I have stated it.

20              I take it there's a limited waiver of appeal right,

21   and it's 87 or below?

22              MS. FLETCHER:  Correct.

23              MR. BECKER:  Yes, your Honor.

24              THE COURT:  All right.

25              Mr. Ketabchi, you have the right to appeal this

J3RVKETS

1    sentence.  If you cannot pay the cost of an appeal, you have

2    the right to apply for leave to appeal *in forma pauperis*.

3             And I am informing you that in your plea agreement you

4    agreed to waive your right to appeal the sentence, and you

5    agreed to waive your right to collaterally attack the sentence

6    if I sentence you to 87 months or below, and I've done that.

7             If you request, the Clerk of Court will prepare and

8    file a notice of appeal on your behalf immediately.

9             Do you understand that?

10            THE DEFENDANT:  Yes, your Honor.

11            THE COURT:  I am recommending to the Bureau of Prisons

12   that this defendant be admitted to the residential drug abuse

13   treatment program if he is otherwise eligible under the BOP

14   rules and regulations.

15            I also will recommend that this defendant be sentenced

16   in the --

17            MR. BECKER:  Your Honor, one of the reasons I asked

18   for Lewisburg is because, A, it's relatively close to the New

19   York area; and, B, it has an RDAP program.  And so --

20            THE COURT:  I'm going to recommend that he be

21   sentenced in the region that New Jersey and Pennsylvania are.

22            Where is your family, sir?  In New Jersey, isn't it?

23            THE DEFENDANT:  Yes, your Honor.

24            Lewisburg is only two hours from my home, so it's

25   very --

J3RVKETS

1          THE COURT:  I'm not going to recommend a specific

2    location.  Your lawyer can make that argument to the Bureau of

3    Prisons.

4          MR. BECKER:  It carries a lot more weight from your

5    Honor.

6          THE COURT:  I'll recommend that he be housed in the

7    region of the Bureau of Prisons which is most -- which is

8    easiest to facilitate family visits with his family which

9    resides in New Jersey.

10          Anything else?

11          Government, anything else?

12          MS. FLETCHER:  The government moves to dismiss open

13    counts.

14          THE COURT:  Granted.

15          Defense, anything else?

16          MR. BECKER:  No, your Honor.

17          THE COURT:  All right.

18          Mr. Ketabchi, I don't think there's anything I need to

19    tell you.  I think you are remorseful and I think you

20    understand completely what you've done.

21          Use the time in prison as effectively as you can.  You

22    are an intelligent person.  I think you now are dedicating your

23    life to a legal path.  You're going to find a lot of people in

24    prison who will use and take advantage of your help.  You've

25    been a very successful mentor and sponsor in Alcoholics

J3RVKETS

Anonymous.  They have those programs in prison as well.  Stick

to that.

Your crimes are substantial.  You were in the trial.

I don't know if you were here every day, but I saw you quite

frequently.  You heard the testimony of the victims and you

heard the testimony of the others.  And you're being sentenced

appropriately for that.

Stay on the right path.  You'll be fine.

MR. BECKER:  Your Honor, I can't help but express my

fear and concern that you're relying on evidence at someone

else's trial that Mr. Ketabchi didn't have a right to confront

witnesses at, that I didn't have a right to cross-examine

witnesses at.

And I know that it's very hard to compartmentalize in

your brain where you hear things from, but to rely on that

evidence, when it was not -- when the litigants to that trial

had every incentive to point fingers at this man and no

incentive to not point fingers, and to be colored by that, as

your Honor has now made clear you are, I think works an

unfairness, and I think is, respectfully, affecting the

sentence, which I don't think it should, your Honor.

THE COURT:  All right.  Thank you.

Let's take a 15-minute break --

MS. FLETCHER:  Sorry, your Honor.

There is the issue of the bail conditions and a

J3RVKETS

1    surrender date.

2              THE COURT:  Oh, I am sorry.  I should have mentioned

3    the bail conditions before.

4              I take it that the government is not seeking remand.

5    I'm not granting it if the government is seeking it.

6              MS. FLETCHER:  We are not.  But we are seeking a short

7    surrender date, a surrender date soon.

8              MR. BECKER:  Your Honor --

9              THE COURT:  Why?  I was going to do April 30th.  Why?

10             MS. FLETCHER:  That's fine, your Honor.

11             THE COURT:  All right.

12             Mr. Ketabchi --

13             MR. BECKER:  Your Honor --

14             THE COURT:  -- shall surrender for service of his

15   sentence at the institution designated by the Bureau of Prisons

16   on or before 2 p.m. on April 30.

17             You have to continue all of your conditions of bail.

18   I have no reason to think you won't, sir.

19             You understand that; correct?

20             THE DEFENDANT:  Yes, your Honor.

21             MR. BECKER:  Your Honor, if I may just say -- and I

22   appreciate the Court authorizing Mr. Ketabchi to surrender to

23   the facility designated by the BOP, which he will, of course,

24   do.

25             In my experience, sometimes it takes longer than a

J3RVKETS

1    month.  If he's designated by the 30th, of course; if he's not,

2    I will ask the Court -- I will make a submission and ask the

3    Court to extend it so that he can surrender --

4              THE COURT:  Absolutely.

5              MR. BECKER:  Thank you.

6              THE COURT:  That's no issue.

7              MR. BECKER:  Thank you.

8              THE COURT:  If he hasn't been designated, come to me

9    and I'll extend the designation date -- I mean the surrender

10   date.

11             MR. BECKER:  Thank you.

12                              *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25